**FEDERAL DEPOSIT INSURANCE CORPORATION, a United States corporation, Plaintiff–Appellant,**

v.

**BANK OF BOULDER, a Colorado corporation, Defendant–Appellee.**

**No. 86–1071.**

United States Court of Appeals, Tenth Circuit.

Aug. 20, 1990.

Ira H. Parker, Federal Deposit Ins. Corp., Washington, D.C., of counsel (John M. Palmeri and Frederick W. Klann of White and Steele, P.C., Denver, Colo., with him on the briefs), for plaintiff-appellant.

Richard L. Eason (Dean G. Panos and David R. Eason with him on the brief) of Eason, Sprague & Wilson, Denver, Colo., for defendant-appellee.

(John J. Gill and Michael F. Crotty of American Bankers Ass'n, Washington, D.C., on the brief, for amicus curiae American Bankers Ass'n.)

Before HOLLOWAY, Chief Judge, McKAY, LOGAN, SEYMOUR, ANDERSON, TACHA, BALDOCK, and BRORBY, Circuit Judges.

McKAY, Circuit Judge.

This case involves an action by the Federal Deposit Insurance Corporation (FDIC) seeking to enforce a letter of credit issued by the defendant Bank of Boulder.

### I. Facts

On June 30, 1982, the Bank of Boulder issued a standby letter of credit to Dominion Bank of Denver in the amount of $27,-000. On September 30, 1983, Dominion Bank of Denver was declared insolvent and ordered closed by the Colorado State Banking Commissioner pursuant to Colo.Rev. Stat. § 11–5–102 (1973 & Supp.1989). The Commissioner then tendered to FDIC an appointment as liquidator of Dominion Bank of Denver pursuant to Colo.Rev.Stat. § 11–5–105 (1973 & Supp.1989). FDIC accepted this appointment pursuant to 12 U.S.C. § 1821(e) (1988).

In furtherance of its role as receiver/liquidator of the bank, FDIC consummated a Purchase and Assumption (P & A) transaction pursuant to authority granted by 12 U.S.C. § 1823(c)(2)(A) (1988). This P & A transaction allowed certain assets of the failed bank to be sold to a healthy bank; and other assets, including the Dominion Bank letter of credit, to be transferred by FDIC as Receiver (FDIC/Receiver) to the FDIC in its corporate capacity (FDIC/Corporation). The assuming bank essentially purchased only those assets in which it was interested and assumed all of the liabilities of Dominion Bank. FDIC/Corporation purchased the remaining assets of the failed Dominion Bank and provided the funds with which FDIC/Receiver paid the assuming bank for the difference between the assets it purchased and the liabilities it assumed. As required, the entire P & A transaction received the approval of the District Court for the City and County of Denver.

On October 5, 1984, FDIC/Corporation attempted to draw on the letter of credit that it had acquired during the P & A transaction. However, Bank of Boulder twice refused to honor the demand for payment. On March 18, 1985, the FDIC brought suit against Bank of Boulder in order to obtain payment on the letter of credit. On April 10, 1985, Bank of Boulder filed a motion to dismiss which was granted by the district court. *FDIC v. Bank of Boulder*, 622 F.Supp. 288 (D.Colo.1985). The district court concluded that the letter of credit could not legally be transferred to FDIC/Corporation; and, thus, there was no federal jurisdiction for the claim. *Id.* at 290.

FDIC/Corporation then filed an appeal of the district court's decision in this court. The panel that heard the appeal reversed the district court's decision, though a dissent was filed. The majority concluded that federal common law allowed the transfer of the letter of credit to FDIC/Corpo-

ration. *FDIC v. Bank of Boulder*, 865 F.2d 1134 (10th Cir.1988). Bank of Boulder then filed a petition for rehearing and a suggestion for rehearing en banc. The en banc court voted to grant the suggestion for rehearing en banc.

The only issue now before the en banc court is whether FDIC/Corporation can purchase a letter of credit from FDIC/Receiver in the course of a P & A transaction, notwithstanding that the letter is nontransferable under state law. After full briefing by both parties and oral argument before the en banc court, we have determined that the original panel majority was correct and that the decision of the district court must be reversed.

## II. Standard of Review

█ The question of whether FDIC/Corporation has the authority to purchase a letter of credit in the course of a P & A transaction is a question of law. We review questions of law de novo. *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263, 1266 (10th Cir.1988). Thus, we are not constrained by the conclusions of the trial court; we are required to review the record in light of our own independent judgment. *State Distrib., Inc. v. Glenmore Distilleries*, 738 F.2d 405, 412 (10th Cir.1984); *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir.1988).

## III. The Mechanics of a Purchase and Assumption Transaction

When a state agency declares a bank insolvent and appoints the FDIC as receiver, FDIC/Receiver may choose among several alternative ways to either liquidate the bank or sell the bank to another bank as a going concern. The two major alternatives include a straight liquidation, in which FDIC simply sells the assets of the bank and pays off the depositors of the bank from the proceeds and from the FDIC insurance fund, and a P & A transaction, in which an assuming bank purchases most of the failed bank's assets and continues to operate the bank as a going concern. Liquidation has several bad effects on the banking community, as the result of the closure of the bank. Depositors lose confidence in the specific failed bank. The public in general loses confidence in the entire banking community. Liquidation also generally involves a major loss to the FDIC's insurance fund. Thus, liquidation is not the favored alternative.

█ The other major alternative, the purchase and assumption transaction,[1] involves three parties: the receiver, the assuming bank, and FDIC as insurer. When FDIC is appointed receiver, it simultaneously acts as the receiver of the failed bank and as the insurer of the deposits. *See FDIC v. All Souls Episcopal Church*, 769 F.2d 658, 662 (10th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986); *FDIC v. Leach*, 772 F.2d 1262, 1264 (6th Cir.1985); *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), *overruled on other*

---

1. Bank of Boulder and amicus curiae suggest that there are many other alternatives available to FDIC when it is appointed receiver of an insolvent bank. Bank and amicus claim that under these alternatives FDIC/Corporation would not be required to purchase any assets. While it is true that these alternatives are available, we need only point out that FDIC is given sole discretion to determine what method it will use to structure failed bank assistance transactions. 12 U.S.C. § 1823(c)(2)(A) (1988); *see Super X Drugs Corp. v. FDIC*, 862 F.2d 1252, 1255 (6th Cir.1988).

In addition, the suggested alternatives merely create a different, although similar, problem. For example, Bank suggests that FDIC/Receiver could transfer all of the failed bank's assets to the assuming bank, while FDIC/Corporation provided the needed funds to balance the difference between the assets received and the liabilities assumed. The problem with this suggestion is that it would require FDIC/Receiver to transfer any letter of credit it acquired as receiver to the assuming bank. Assuming the letter of credit is nontransferable, this scenario presents a very similar problem to the transfer of a letter of credit to FDIC/Corporation. Finally, we note that there will be times that FDIC will determine in its sole discretion that a P & A transaction is appropriate. In fact, the P & A is used by FDIC more often—by far—than any other alternative. For calendar years 1984 through 1988, 544 of the 719 commercial bank failures—or 76 percent—were handled through P & A transactions. *See FDIC Ann. Rep.* (1984–1988).

*grounds, Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *FDIC v. Ashley,* 585 F.2d 157, 160 (6th Cir.1978); *FDIC v. Godshall,* 558 F.2d 220, 222 n. 4 (4th Cir.1977); *Freeling v. Sebring,* 296 F.2d 244, 245 (10th Cir.1961); *FDIC v. Hudson,* 643 F.Supp. 496, 498 (D.Kan. 1986). When a state bank fails and FDIC is tendered the appointment as receiver, it is statutorily obligated to accept the appointment. *See* 12 U.S.C. § 1821(e) (1988). Thus, FDIC cannot avoid acting in two capacities in a P & A transaction.

In a P & A transaction, the assuming bank buys the assets of the failed bank that are of the highest banking quality. The assuming bank also assumes the deposit liabilities of the failed bank. As a result, the amount of deposit liabilities that the bank assumes is greater than the value of the assets it purchases. In order to make the purchase of the failed bank attractive to the assuming bank, FDIC/Receiver pays cash to the assuming bank in an amount sufficient to cause the assets the bank purchases to be equal to the liabilities it assumes, less some credit for the going concern value of the failed bank. The cash paid by FDIC/Receiver to the assuming bank is paid from FDIC/Corporation's insurance fund. In consideration for these funds, FDIC/Corporation acquires the assets of the failed bank that are not transferred to the assuming bank. FDIC/Corporation's "purchase" of the non-transferred assets is authorized by 12 U.S.C. § 1823(c)(2)(A) (1988). FDIC/Re-

ceiver is authorized to offer the assets of the failed bank for sale to FDIC/Corporation by 12 U.S.C. § 1823(d) (1988). Ultimately, then, FDIC/Corporation finances the P & A transaction by providing the funds with which FDIC/Receiver pays the assuming bank. *Cf. Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).

■ After FDIC/Corporation acquires the nontransferred assets in the P & A, it attempts to enforce and liquidate these assets to recoup its cash outlay and thereby minimize the loss to the insurance fund. In so doing, FDIC/Corporation may bring actions and prosecute claims in its own right. *See FDIC v. Braemoor Assoc.,* 686 F.2d 550, 552 (7th Cir.1982); *FDIC v. Ashley,* 585 F.2d 157, 159–64 (6th Cir.1978); *FDIC v. Godshall,* 558 F.2d 220, 222–23 (4th Cir. 1977); *Hudson,* 643 F.Supp. 496, 497 (D.Kan.1986).

In order for a P & A to be implemented by FDIC, the P & A must be less costly than the other major alternative of liquidating the failed bank.[2] 12 U.S.C. § 1823(c)(4)(A) (1988). Making the determination of whether a P & A would be less expensive than a simple liquidation requires a quick review of the failed bank's books and records. This review of assets must be quick—usually overnight—because a P & A transaction requires the bank to reopen quickly in order to maintain the going concern value of the failed bank. *Langley,* 108 S.Ct. at 401.[3]

---

**2.** A P & A may also be approved in the extraordinary case when the FDIC determines that the continued operation of an insured bank is "essential to provide adequate banking services in [the] community." 12 U.S.C. § 1823(c)(4)(A) (1988); *see FDIC v. Wood,* 758 F.2d 156, 161 (6th Cir.1985).

**3.** Bank of Boulder and amicus curiae argue that P & A transactions do not occur overnight. They claim that FDIC closely observes banks, particularly failing banks, for long periods of time prior to any failure. Thus, the argument continues, FDIC is familiar with the assets of all failing banks prior to the actual P & A transaction; and a close review of assets is not required the night before the transaction takes place. Bank and amicus curiae cite a book written by a former FDIC director to support their claim.

Conversely, FDIC points out that every court, including the United States Supreme Court, that has considered the time frame issue has concluded that such transactions are done at a quick enough pace that a detailed review of assets is not possible. *See Langley,* 108 S.Ct. at 401; *FDIC v. Leach,* 772 F.2d 1262, 1264 (6th Cir.1985); *FDIC v. Merchants Nat'l Bank of Mobile,* 725 F.2d 634, 638 (11th Cir.1984); *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.1982); *FDIC v. Sarvis,* 697 F.Supp. 1161, 1164 (D.Colo. 1988); *FDIC v. Ritchie,* 646 F.Supp. 1581, 1583 (D.Neb.1986); *FDIC v. National Union Fire Ins. Co.,* 630 F.Supp. 1149, 1154 (W.D.La.1986). We are inclined to agree with these courts, and with the current FDIC, that P & A transactions must be completed with extraordinary speed. When a bank fails, FDIC must make the decision whether to reopen the bank through a P & A transaction very quickly. If the bank is closed

In this case FDIC chose to proceed through the mechanism of a P & A transaction. As a result of this transaction, FDIC/Corporation acquired the letter of credit from the failed bank. We believe that the transfer of this letter of credit to FDIC/Corporation must be upheld for two independent reasons. We hold that both the federal statutory law and the federal common law allow the transfer of the letter of credit to FDIC/Corporation.

### IV. Federal Jurisdiction

The district court dismissed the instant case on two grounds. First, it concluded that the letter of credit could not be transferred to FDIC/Corporation; therefore, FDIC/Corporation could not sue to enforce the letter of credit. Second, the district court found that if it was FDIC/Receiver that brought suit on the letter of credit, there was no federal subject matter jurisdiction. We reverse only the first finding. However, because we hold that a letter of credit can be transferred to FDIC/Corporation, we also hold that federal subject matter jurisdiction exists in this case.

■ Under 12 U.S.C. § 1819 (Fourth) (1988), Congress specifically granted the FDIC the following powers:

> To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof. . . .

Thus, we hold that Congress has provided federal subject matter jurisdiction for cases involving the FDIC. Two circuit courts have found this grant of jurisdiction to be very expansive, indicating Congress' desire that cases involving FDIC should generally be heard and decided by the federal courts. *See FDIC v. Nichols*, 885 F.2d 633, 636 (9th

Cir.1989); *FDIC v. Sumner Financial Corp.*, 602 F.2d 670, 678 (5th Cir.1979).

■ Section 1819 (Fourth) also contains an exception to this general grant of federal jurisdiction over FDIC cases. Jurisdiction is vested "except that any suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders and such State bank under State law shall not be deemed to arise under the laws of the United States." 12 U.S.C. § 1819 (Fourth) (1988). The Sixth Circuit has held that in order for this exception to apply three conditions must be met: "First, the FDIC must be a party to 'such suit' in its capacity as a receiver of a state bank. . . . Second, the suit must involve only the rights or obligations of depositors, creditors, stockholders, and the state bank itself. . . . Third, the suit must involve such rights or obligations under state law." *In re Southern Indus. Banking Corp.*, 872 F.2d 1257, 1260 (6th Cir.1989); *see also, Nichols*, 885 F.2d at 636. We agree with the Sixth Circuit's holding and adopt its three-part test.

■ To resolve this case, we need go no further than the first requirement. We hold that the transfer to FDIC/Corporation was valid. Thus, FDIC/Corporation, not FDIC/Receiver, brought this suit and the first prong of the exception is not fulfilled. *Cf. Nichols*, 885 F.2d at 636–37. Consequently, federal jurisdiction exists for this suit.

Bank of Boulder argues that it was actually FDIC/Receiver that brought suit to enforce the letter of credit. We simply note that this contention is inconsistent with the Bank's position that FDIC/Receiver would be entitled to draft on the letter of credit. Bank of Boulder rejected FDIC's drafts on the letter, presumably because the Bank thought that FDIC was acting in its corporate capacity. If FDIC/Receiver actually submitted the draft to the Bank,

for virtually any amount of time, the going concern value of the bank is dramatically decreased. Even if FDIC has some familiarity with the assets of these banks, we believe that

the nature of the P & A transaction does not allow careful review of assets prior to the failure of the bank.

then Bank should have honored the draft. Since Bank did not honor the draft, we must assume that FDIC/Corporation presented the draft on the letter. Thus, FDIC/Corporation is the party now seeking enforcement of the letter. Because we hold that FDIC/Corporation is the entity suing to enforce the letter, we also hold that federal subject matter jurisdiction exists.

### V. Federal Statutory Law

Colorado law specifically provides that a letter of credit is not normally assignable. "The right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable." Colo.Rev.Stat. § 4–5–116(1) (1973). However, it is uncontested that notwithstanding this provision, FDIC/Receiver may validly obtain possession of a letter of credit from a failed bank by operation of law. In fact, Colorado law provides that when the FDIC accepts appointment as liquidator of a failed bank, the state banking commissioner shall file a certificate evidencing the appointment and "the possession of all the assets, business, and property of such bank of every kind and nature, wheresoever situated, shall be deemed transferred from such bank and the commissioner to the federal deposit insurance corporation or its successor." Colo.Rev.Stat. § 11–5–105(3) (Supp.1989). This provision is consistent with the long-recognized principle that anti-assignment provisions do not bar the passing of claims by operation of law. *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 374, 70 S.Ct. 207, 212, 94 L.Ed. 171 (1949). Thus, it is undisputed that FDIC/Receiver could enforce the letter of credit.

Because it was FDIC/Corporation that attempted to enforce the letter of credit, however, the question presented by this appeal is whether FDIC/Receiver can transfer its rights under the letter of credit to FDIC/Corporation. Initially we note that Colorado law could be interpreted specifically to provide for such a transfer by statute. The Colorado statute immediately following the section that allows FDIC/Receiver to become liquidator of a failed bank states: "[A]ll or any part of the assets of [a failed bank] may be sold to the corporation by the ... liquidator...." Colo.Rev. Stat. § 11–5–106(1) (Supp.1989). It is at least arguable that this provision creates the power in FDIC/Receiver—as liquidator—to transfer all of the assets of a failed bank to FDIC/Corporation. However, we choose not to base our decision on this ground. We believe that to overcome the clear prohibition against the transfer of letters of credit, the Colorado legislature must state more clearly that FDIC/Receiver has the power to transfer otherwise nontransferable assets to FDIC/Corporation. We note, however, that Colorado law is far from clear on this issue.

Ultimately, we conclude that Colorado's general restriction on the transfer of letters of credit is preempted by federal law in the case of a transfer from FDIC/Receiver to FDIC/Corporation in the course of a P & A. With regard to preemption, the Supreme Court has stated:

> [W]here Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when ... state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Pacific Gas & Elec. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Here, the federal statute controlling FDIC states:

> In order to facilitate a merger or consolidation of an insured bank ... with an insured institution or the sale of assets of such insured bank and the assumption of such insured bank's liabilities by an insured institution, or the acquisition of the stock of such insured bank, the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe —(i) to purchase any such assets or assume any such liabilities....

12 U.S.C. § 1823(c)(2)(A) (1988). This statute clearly gives FDIC/Corporation the au-

thority to purchase "any assets" of a failed bank in order to facilitate the purchase of a failed bank by an assuming bank. The language of the statute is *not* limited to any *transferable* assets. Thus, we hold that section 1823(c)(2)(A) creates a power in FDIC/Corporation to purchase any assets, including assets nontransferable under state law, from FDIC/Receiver in order to facilitate a P & A transaction. Consequently, we hold that this statute preempts any Colorado restriction on the transferability of letters of credit from FDIC/Receiver to FDIC/Corporation in the course of a P & A.

Bank of Boulder argues that the above holding ignores the fact that section 1823 does not grant FDIC/Receiver the authority to sell the assets to FDIC/Corporation. We find this argument particularly weak when we consider the language of Colo. Rev.Stat. § 11–5–106(1) which grants FDIC/Receiver the authority to sell any assets of a failed bank to FDIC/Corporation. "[A]ll or any part of the assets of [a failed bank] may be sold to the corporation by the [FDIC/Receiver as liquidator]." Colo.Rev.Stat. § 11–5–106(1) (Supp.1989). FDIC/Receiver is also granted the power "to offer the assets of [failed] banks for sale to the Corporation...." 12 U.S.C. § 1823(d) (1988).

Bank of Boulder's argument identifies Bank's fundamental misunderstanding of the nature of P & A transactions. P & A transactions do not consist of two independent purchases and sales. Instead, P & A transactions are made up of two very intertwined purchases and sales. FDIC/Receiver sells the highest quality assets to the assuming bank. The assuming bank in turn agrees to assume all of the failed bank's liabilities. However, in order for the assuming bank to be willing to take on all of these liabilities, FDIC/Receiver must provide the difference in cash between the assets purchased and the liabilities assumed—less an amount for the going concern value of the bank. The difference in cash comes from FDIC/Corporation. As a result, the entire transaction is financed by FDIC/Corporation. There would be no P & A if FDIC/Corporation did not provide

the extra cash. In return for this cash outlay, FDIC/Corporation is entitled to the remaining assets of the failed bank. Thus, although there are actually two purchases and sales in a P & A, they are so intertwined that one could not occur without the other.

Several federal cases support our holding that the federal FDIC statute authorizes the transfer of assets—nontransferable under state law—from FDIC/Receiver to FDIC/Corporation. *See, e.g., Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355, 358 (5th Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); *FDIC v. Rectenwall*, 97 F.Supp. 273 (N.D. Ind.1951). In *Rectenwall*, the court found that a tort claim that was nonassignable under state law could be transferred to FDIC/Corporation under the precursor statute to current section 1823.

> Whatever might be said of the adequacy of the language used, it is nonetheless apparent that the statutory scheme embodied in this section contemplates the unrestricted transferability of every asset of an insured bank, at least where necessary to accomplish the assumption of its deposit liabilities by another insured bank.

*Rectenwall*, 97 F.Supp. at 274. Another federal district court reached the same conclusion concerning the transferability of a tort claim under the very similar FSLIC statute. *See FSLIC v. Fielding*, 309 F.Supp. 1146, 1151 (D.Nev.1969), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971).

This rule of law has been consistently applied by more recent federal cases. In *FDIC v. Hudson*, 643 F.Supp. 496 (D.Kan. 1986), a district court in this circuit specifically noted that "defendants claim that as receiver, the FDIC's right to bring a tort action is not assignable under Kansas law to the FDIC as a corporation.... [However,] federal law applies in these actions, and ... tort law claims are assignable, although state law would not allow it". *Hudson*, 643 F.Supp. at 498. In *FDIC v. Main Hurdman*, 655 F.Supp. 259 (E.D.Cal. 1987), the court held that a tort claim was

assignable to the FDIC pursuant to a rescue without reference to state law. The court pointed out:

> [T]he congressional purpose in creating the FDIC would be inhibited by application of state law strictures. Moreover, free assignability of assets from failing insured banks to the FDIC realistically addresses the frequent need of the FDIC to operate under emergency conditions in rescue situations. A need by the FDIC to determine assignability on an asset-by-asset basis would surely slow a rescue operation down, when dispatch was required.

*Main Hurdman,* 655 F.Supp. at 268. *See also FDIC v. Abraham,* 439 F.Supp. 1150, 1152 (E.D.La.1977).[4]

We believe that the rule of law announced in these cases with regard to the assignability of tort claims is equally applicable to the assignability of letters of credit. The purpose of the assignment in both cases is to allow FDIC/Corporation to collect on the assigned assets in order to defray part of the losses sustained by the insurance fund. The language of the cases is universal in scope and reasoning, thus including letters of credit, particularly when discussing the need for speed in accomplishing a P & A transaction. Consequently, we hold that federal statutory law preempts contradictory state law and allows nontransferable letters of credit to be transferred from FDIC/Receiver to FDIC/Corporation in the course of bank rescue operations, including P & A transactions.

## VI. Federal Common Law

 Although we conclude that federal statutory law provides a clear answer to the issue presented by this case, we also believe that federal common law requires a uniform rule of transferability of letters of credit to FDIC/Corporation in the course of P & A transactions. We recognize that resort to federal common law is only necessary where Congress has not plainly spo-

ken to the matter under consideration. *Milwaukee v. Illinois,* 451 U.S. 304, 313–14, 101 S.Ct. 1784, 1790–91, 68 L.Ed.2d 114 (1981). Thus, we include the following discussion of federal common law as an alternative basis for our decision. Even if our preemption analysis were not correct, we believe that it would then be necessary to apply federal common law with the same result as shown hereafter.

The United States Supreme Court has enunciated a three-pronged test to determine whether a federal common law rule is needed to supersede conflicting state law. In *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court explained the three requirements for creating a federal common law rule.

> [First,] federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules.... [Second, a]part from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. [Third], our choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

*Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59.

We first consider the need for a nationally uniform rule allowing FDIC/Corporation to acquire nontransferable assets of failed banks in the course of P & A transactions. We are convinced that such a rule is needed. Without such a rule, FDIC/Corporation is subjected to all transfer restrictions and is faced with an enormous administrative burden in trying to determine whether or not to finance a P & A. Specifically, FDIC/Corporation would have to determine the transferability status of every

---

**4.** Analogously, a recent Fifth Circuit case held that FDIC/Receiver has the power to transfer fiduciary appointments held by an insolvent bank to a federally-created bridge bank, and

that contrary state law was preempted. *See CNB Texas Nat'l Bank v. Cowden,* 895 F.2d 1488, 1499–1501 (5th Cir.1990).

asset. Because the terms of one asset differ from the terms of another, FDIC/Corporation would not be able to limit its evaluation of the failed bank's assets to a quick review of the failed bank's records. Instead, FDIC/Corporation would be forced to examine in detail the terms of every asset to determine which state law applies, whether the asset itself restricts transferability, and whether the asset refers to other laws that may impact the asset's transferability. FDIC/Corporation would then have to locate, review, and interpret all laws applicable to the asset to find every possible transfer restriction. To require FDIC/Corporation to do all this under the stringent time constraints of a P & A is asking the impossible. Hence, the option of handling bank failures through the P & A method would be foreclosed. Such a result runs directly counter to the policies behind the creation of the FDIC—promoting stability and confidence in the banking system.

The difficulty with determining, under the time constraints of a P & A, whether or not an asset is transferable is evident in this case. The letter of credit did not indicate on its face that it was nontransferable. As discussed in section V, there is some question whether Colorado law would make this letter of credit nontransferable to FDIC/Corporation, although it is clearly non-transferable to other parties. Although the letter was made subject to the UCP,[5] we fail to find discussion in the UCP concerning the specific situation under question—the transfer from FDIC/Receiver to FDIC/Corporation. Instead, the UCP merely contains a blanket restriction on transfer. In order to implement a P & A in this case, FDIC/Corporation would have had to determine which state law applied to the letter and then review and interpret Colorado law and the UCP. The need for expeditious implementation of a P & A suggests that the FDIC, in either of its capacities, cannot be expected to examine all the assets of a failed bank to locate all possible transfer restrictions. *See Lang-*

*ley,* 108 S.Ct. at 401; *Gilman v. FDIC,* 660 F.2d 688, 694–95 (6th Cir.1981); *FDIC v. Stone,* 578 F.Supp. 144, 146 (E.D.Mich. 1983).

Bank of Boulder and amicus curiae claim that state and international law concerning the transferability of letters of credit is already uniform and thus no federal common law rule is needed. We agree that the general rule for transfers of letters of credit between ordinary commercial parties is clear and uniform. However, as we discussed earlier, we believe that the Colorado rules concerning transfers between FDIC/Receiver and FDIC/Corporation during a P & A are far from clear. Thus, at least Colorado law may not be uniform. Also, both parties agree that a letter of credit is "transferable" to FDIC/Receiver when it is appointed receiver for a failed bank. It is a small step to conclude that FDIC/Corporation could also enforce the letter of credit when assisting FDIC/Receiver in fulfilling its duties in the course of a P & A. Thus, we conclude that state and international laws are not clear or uniform.

A uniform rule permitting FDIC/Corporation to acquire otherwise nontransferable assets in a P & A eliminates the need for detailed examination of the failed bank's assets and of varying laws. Cost estimates can be made quickly and with greater accuracy, and P & A's can thereby be implemented with fewer risks and with the necessary speed. Because the P & A is an extremely valuable tool, such a uniform rule furthers the obvious advantages of P & A's and the interests of the federal deposit insurance program. Indeed, the

> free assignability of assets from failing insured banks to the FDIC realistically addresses the frequent need of the FDIC to operate under emergency conditions in rescue situations. A need by the FDIC to determine assignability on an asset-by-asset basis would surely slow a rescue operation down, when dispatch was required.

---

5. Uniform Customs and Practice for Documentary Credits, International Chamber of Com- merce Publication No. 290 (1974 Revision).

*Main Hurdman,* 655 F.Supp. at 268. Moreover, P & A's will be more cost effective because transfer restrictions will not preclude recovery to the insurance fund.

The second issue we address under *Kimbell Foods* is whether state law transfer restrictions would frustrate the specific federal objectives of the FDIC. We hold that application of state transfer restrictions frustrates and significantly interferes with the objectives of the federal deposit insurance program. As discussed above, there are times when only a P & A transaction will serve the interests of the public, the insurance fund, the failed bank's depositors, and the failed bank's creditors. If transfer restrictions are enforced against FDIC/Corporation, it may not be able to collect on the nontransferable assets and P & A's become more expensive. In light of the congressional requirement that P & A's be less costly than liquidation, increasing the cost of P & A's could very well prevent P & A's in many cases. Elimination of P & A's as an option for FDIC/Receiver would cause a great interference in the effective performance of the FDIC's mission to stabilize the banking industry.

Furthermore, even if a P & A is estimated to be less costly than full-scale liquidation notwithstanding application of transfer restrictions, the fact that FDIC/Corporation would be forced to examine every asset in detail and review and analyze varying laws to locate possible restrictions would delay implementation of the P & A, thereby diluting its advantages. Because speed is the essence of P & A's, FDIC/Corporation may have to forgo an exhaustive examination and enter P & A's at a substantial risk of loss to the insurance fund. Or, FDIC/Corporation may be forced to choose not to implement P & A's because a reasonably accurate cost estimate cannot be made within the limited time demand. "[D]ecisions concerning the appropriate method of dealing with a bank failure must be made with extraordinary speed.... Subjecting the FDIC to the additional burden of considering the impact of possibly variable state law on the rights involved could significantly impair the FDIC's ability to choose between the liquidation and [P & A] alternatives in handling a bank failure." *Gunter v. Hutcheson,* 674 F.2d 862, 869 (11th Cir.1982).

Finally, under *Kimbell Foods* we must consider whether the application of a federal rule would disrupt commercial relationships predicated on state law. We are convinced that application of a federal rule permitting FDIC/Corporation to acquire non-transferable letters of credit in the course of P & A's would not disrupt commercial relationships predicated on state law. The rule would come into effect only after an insured bank has failed. Parties cannot reasonably expect to carry on normal commercial relationships at that point, and it is doubtful that the eventuality of bank failure plays a significant role in the ordinary commercial expectations of the parties. Indeed, the potential damage to parties' expectations is far outweighed by the interference with the federal goals of stability and confidence in the national banking system that would result if FDIC/Corporation were not allowed to acquire nontransferable assets in P & A's.

Moreover, application of the rule we adopt simply means that FDIC/Corporation, not FDIC/Receiver, is entitled to enforce the terms of the letter of credit. Both parties agree that FDIC/Receiver can enforce the letter. Because the issuer must go beyond the letter itself to honor FDIC/Receiver's demands for payment, the mere transfer of the letter to FDIC/Corporation as a part of a P & A—thus requiring the issuer to pay FDIC/Corporation rather than FDIC/Receiver—does not place a substantial burden on the issuer. This is particularly true when the true nature of FDIC/Corporation's crucial role in financing a P & A is understood. FDIC/Corporation merely assists FDIC/Receiver in its role as liquidator. Thus, a transfer to FDIC/Corporation from FDIC/Receiver is not likely to upset any reasonable commercial expectations. However, it is important to note that our holding is limited only to transfers from FDIC/Receiver to FDIC/Corporation in the course of P & A's. We do not address the

effect of other transfers on the business expectations of the parties.

Finally, we note that if Colorado's transfer restrictions were enforced against FDIC/Corporation in this case, Bank of Boulder would likely receive an unexpected benefit. We assume that when the letter of credit was issued, the parties understood that if Dominion Bank went bankrupt, a receiver with the power to enforce the credit would be appointed. If FDIC/Corporation is not allowed to enforce the letter of credit while fulfilling its function of assisting FDIC/Receiver, then Bank of Boulder will be freed of its obligation to honor drafts of the receiver of Dominion Bank. Clearly, Bank of Boulder could not have had a reasonable commercial expectation based on state law that if Dominion Bank went bankrupt, Bank of Boulder would be relieved of all liability under the letter of credit.

## VII. Conclusion

We hold that federal statutory law provides a clear rule concerning the transfer of letters of credit by FDIC/Receiver to FDIC/Corporation during rescues of failed banks. Letters of credit—nontransferable under state law—must be transferable from FDIC/Receiver to FDIC/Corporation during the course of P & A's. In addition, we hold in the alternative that even if federal statutory law does not provide a clear answer to the transfer issue, federal common law requires a uniform federal rule allowing the transfer of letters of credit from FDIC/Receiver to FDIC/Corporation in the course of a P & A. We also hold that in this case it was FDIC/Corporation which sought to enforce the letter of credit that was validly transferred to it

from FDIC/Receiver. Thus, federal subject matter jurisdiction exists for this suit.

The decision of the district court that this letter of credit could not be transferred by FDIC/Receiver to FDIC/Corporation is REVERSED.

LOGAN, Circuit Judge, concurring:

I agree with the majority's ultimate conclusion, but I do not think that it requires resort to either federal statutory preemption or federal common law. The federal statute, 12 U.S.C. § 1823(c)(2)(A), seems clearly to permit the transfer to FDIC/Corporation of *any* assets of a failed bank taken over by FDIC/Receiver. The Colorado statutory scheme seems clearly to contemplate the identical result. *See* Colo. Rev.Stat. §§ 11–5–105 to 106. Thus I do not believe that this is a case in which "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See* majority opinion, *supra,* at 1472 (quoting *Pacific Gas & Elec. v. State Energy Resources Conserv. & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983)).

BALDOCK, Circuit Judge, with whom TACHA and BRORBY, Circuit Judges, join, concurring in part and dissenting in part.

I concur in the court's decision that Colo. Rev.Stat. § 11–5–106(1)[1] (Supp.1989) does not operate to make this letter of credit (documentary credit) assignable from FDIC-receiver to FDIC-corporation given the express provision against such assignment contained in the UCP and Colo.Rev.

---

1. Colo.Rev.Stat. § 11–5–106 (Supp.1989) provides in part:

 **Assets sold or pledged as security.** (1) With respect to any banking institution closed on account of inability to meet the demands of its depositors or by action of the banking board or by action of its directors or in the event of its capital inadequacy or suspension, the liquidator of such institution may borrow from the federal deposit insurance corporation and furnish any part or all of the assets of said institution to said corporation as security for a loan from same, but, if said cor-

 poration is acting as such liquidator, the order of a court of record of competent jurisdiction shall be first obtained approving such loan. Upon the order of a court of record of competent jurisdiction, all or any part of the assets of such institution may be sold to the corporation by the banking board, or by the liquidator with the permission of the banking board.

 1957 Colo.Sess.Laws ch. 86, § 1 at 271, *as amended by* I 1989 Colo.Sess.Laws ch. 93, § 17 at 541.

Stat. § 4–5–116(1)[2] (1974). The two statutes speak to different subjects, and do not conflict if § 11–5–106(1) is read as a rule of administration rather than a substantive rule of property controlling the assignment of bank assets. *See Moran v. Carlstrom*, 775 P.2d 1176, 1182–83 (Colo.1989) (court should harmonize potentially conflicting statutes whenever possible so as to give effect to each statute). Even if the potential conflict between § 11–5–106(1) and § 4–5–116(1) was viewed as irreconcilable, § 4–5–116(1) concerning assignment of letters of credit would prevail because it is the later and more particular enactment. *See Public Employees Retirement Assn. v. Greene*, 580 P.2d 385, 387 (Colo.1978) (when statutes conflict, later enactment controls); *Moran*, 775 P.2d at 1183 (when statutes conflict, more specific statute controls).

I also concur in the court's decision that we have jurisdiction to consider FDIC-corporation's claim under 12 U.S.C. § 1819 (Fourth) because FDIC in its corporate capacity acquired the documentary credit from itself in its capacity as receiver. "[T]he presence of an intra-FDIC transfer does not deprive the district court of subject matter jurisdiction." *See FDIC v. Nichols*, 885 F.2d 633, 636–37 (9th Cir. 1989). Thus, we have jurisdiction to consider the appeal.

I respectfully dissent, however, from the court's decision that FDIC-corporation may draw upon the documentary credit. The court decides that FDIC-corporation takes free of assignment restrictions created by state law because FDIC-corporation has the power to purchase any asset of a failed bank under 12 U.S.C. § 1823(c)(2)(A). Having decided the question before it on federal statutory preemption, the court then

forges federal common law. However, when a federal statute provides the answer, we are without authority to supplement the field with federal common law. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 312–14, 101 S.Ct. 1784, 1789–91, 68 L.Ed.2d 114 (1981); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). The court's approach is in marked contrast with courts which have developed federal common law to allow the FDIC to prevail; other courts have done so only when federal statutory preemption was not an available ground. *See, e.g., FDIC v. Leach*, 772 F.2d 1262, 1268 (6th Cir.) (12 U.S.C. § 1823(e) does not bar failure of consideration defense, but federal common law does); *FDIC v. Wood*, 758 F.2d 156, 159 (6th Cir.1985) (§ 1823(e) does not grant FDIC holder in due course status which would be unavailable under state law, but federal common law does), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985).

What drives the court's opinion is the notion that the FDIC undertakes purchase and assumption transactions in a fire-drill atmosphere and cannot be expected to review or abide by state law restrictions concerning the assignment of letters of credit.[3] To be sure, the Supreme Court in *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), has indicated that in such transactions the evaluation of a failed bank's assets "must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'" *Id.* at 91, 108 S.Ct. at 401 (quoting *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)).

---

**2.** Colo.Rev.Stat. § 4–5–116 (1974) provides in part:

> **Transfer and assignment.** (1) The right to draw under a credit can be transferred or assigned only when the credit is expressly designated as transferable or assignable.

This provision was enacted in 1965 when Colorado enacted the Uniform Commercial Code, including art. 5 which deals with letters of credit. *See* 1965 Colo.Sess.Laws ch. 330, § 155–5–116 at 1401.

**3.** As a factual matter, the note backed by the documentary credit was contained in the failing bank's records; no snap decision on the part of the FDIC was necessary. The FDIC decided to keep this asset (in all likelihood long before the failed bank's assets were offered for sale) well-knowing that if the asset was sold to another bank, the documentary credit would be worthless to the assuming bank.

But this language should be read in the context of *Langley's* holding that 12 U.S.C. § 1823(e) [4] bars a defense of "fraud in the inducement even when the fraud did not take the form of an express promise." [5] *Langley*, 484 U.S. at 90, 96, 108 S.Ct. at 400. In discussing the purposes underlying 12 U.S.C. § 1823(e) the Court indicated that "[o]ne purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of a bank's assets." *Langley*, 484 U.S. at 91, 108 S.Ct. at 401. The Court stated:

> The last kind of evaluation [for purchase and assumption], in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter v. Hutcheson*, 674 F.2d at 865. Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

*Langley*, 484 U.S. at 91–92, 108 S.Ct. at 401–02. The FDIC under § 1823(e) is not held to undisclosed oral conditions, even if fraudulent and known. *Langley*, 484 U.S. at 93–96, 108 S.Ct. at 402–03. Other cases have justified the result that the FDIC takes free of fraud in the inducement and other personal defenses in part because a purchase and assumption agreement must be accomplished quickly. *See Leach*, 772 F.2d at 1264, 1266–67 (FDIC takes free of personal defenses including failure of consideration and usury because FDIC is a

holder in due course as a matter of federal common law); *Wood*, 758 F.2d at 160–61 (same concerning personal defense of usury); *Gunter*, 674 F.2d at 865, 868 (FDIC takes free of defense of fraud in the inducement as a matter of federal common law); *FDIC v. Merchants Nat'l Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.) (FDIC takes under § 1823(e) free of claim that bank participated only in unguaranteed portion of loan), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984).

The documentary credit in this case is not a "seemingly unqualified" asset "that [is] in fact subject to undisclosed conditions," which would escape the attention of the FDIC. *See Langley*, 484 U.S. at 92, 108 S.Ct. at 401. Nor is this a situation in which the Bank of Boulder should be precluded from asserting its defense to payment because it knowingly contributed to a misrepresentation which affected the FDIC. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 459–61, 62 S.Ct. 676, 680–82, 86 L.Ed. 956 (1942). On its face, the letter of credit states:

> This credit is subject to the "Uniform Customs and Practices for Documentary Credits [UCP]" (1974 Revision), International Chamber of Commerce Brochure No. 290.

The 1974 UCP referenced in the letter of credit provides that: "A credit can be transferred only if it is expressly designated as 'transferable' by the issuing bank." 1974 UCP art. 46(b).

Although UCP art. 46(b) is similar to Colo.Rev.Stat. § 4–5–116(1) concerning as-

**4.** 12 U.S.C. § 1823(e) provides:

**Agreements against interests of the Corporation.** No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

**5.** In *Langley*, the Court reaffirmed the broad protection afforded the FDIC under § 1823(e). The Court rejected a distinction, discussed in several cases, *see FDIC v. Langley*, 792 F.2d 541, 546 (5th Cir.1986), *aff'd*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *FDIC v. Hatmaker*, 756 F.2d 34, 37 (6th Cir.1985); *Gunter*, 674 F.2d at 867, that § 1823(e) only barred a defense of an oral side agreement pursuant to a contract, but not a defense that an entire contract was void due to fraud not tied to any contractual promise. *Langley*, 484 U.S. at 90–93, 108 S.Ct. at 401–02.

signment, the court never addresses the fact that the *source* of the assignment restriction in this case is not state law, but rather a private agreement which incorporated the 1974 UCP as the rule of decision. Surely the parties have the right to have the documentary credit controlled by the UCP, rather than by state law, even if the two are similar concerning assignment. *See* 2 J. White & S. Summers, *Uniform Commercial Code* § 19–3 at 16–18, § 19–4 at 22 ("the general principle of freedom of contract reigns in Article 5.") (1988); Colo. Rev.Stat. § 4–1–102(3) (1974) (effect of UCC provisions generally may be varied by agreement). While the FDIC has prevailed in many instances on a theory of federal preemption of state law, *see e.g.*, *NCNB Texas Nat'l Bank v. Cowden*, 895 F.2d 1488, 1501–03 (5th Cir.1990), federal law should not be allowed to displace the private agreement between the parties.

The FDIC might benefit handsomely by allowing it to judicially and unilaterally redraft the instruments it acquires from a failed bank to avoid the acquisition of worthless assets. For example, additional collateral might be added to secure a worthless note or a better legal description of real property might be added to mortgaged real property about to be foreclosed. But no one would suggest that merely because FDIC–Corporation has the power under 18 U.S.C. § 1823(c)(2)(A) "to purchase any ... assets" of a failed bank, it may change the express written terms of those assets so as to increase their value. Yet, that is what the court has done by ignoring the source of the assignment restriction in this case. The private provision concerning the applicability of the UCP to this documentary credit, hence the UCP restriction on assignment, has been read out of the parties' agreement.

Even assuming, *arguendo*, that the source of the assignment restriction was grounded in state law, I do not agree that a rule concerning "the assignability of tort claims is equally applicable to the assignability of letters of credit." Court's Opinion at 1474. In deciding that 12 U.S.C.

§ 1823(c)(2)(A) allows FDIC-corporation to purchase or acquire assets free of transferability restrictions, the court relies upon cases involving the assignability of tort actions to the FDIC against those who may have contributed to the bank's insolvency. *See FDIC v. Main Hurdman*, 655 F.Supp. 259 (E.D.Cal.1987) (tort action against accounting firm which prepared allegedly false financial statements for borrower); *FDIC v. Hudson*, 643 F.Supp. 496 (D.Kan. 1986) (tort action against bank's officers, directors and employees); *FDIC v. Abraham*, 439 F.Supp. 1150, 1153 (E.D.La.1977) (tort action against former directors; any state law prohibition on assignment not an issue); *FSLIC v. Fielding*, 309 F.Supp. 1146 (D.Nev.1969) (suit against officers, directors and others associated with savings and loan association), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971); *FDIC v. Rectenwall*, 97 F.Supp. 273 (N.D. Ind.1951) (tort action against cashier who allegedly paid drafts when drawer's accounts were insufficient to cover the drafts). A case cited by the court which did not involve a tort or quasi-tort action, *Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355 (5th Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982), also did not involve a state law prohibition on assignment of the note in question. The court in that case specifically noted that it "need not decide what result would obtain if state law made the FDIC's rights worthless." *Id.* at 358 n. 4.

The court holds that the language in the cases concerning assignment of tort actions to the FDIC "is universal in scope and reasoning, thus including letters of credit, particularly when discussing the need for speed in a P & A transaction." Court's Opinion at 1474. Apart from obvious differences between a tort and a contract, different implications arise from the assignment of tort actions and letters of credit which should inform our judgment. The commercial usefulness of a documentary credit depends upon the doctrines of independence[6] and strict compliance.[7] Allow-

---

**6.** The relationship between the issuer and the beneficiary is independent of the underlying (Footnote 6 continued on p. 1481)

**7.** See note 7 on page 1481.

ing the beneficiary to assign its interest, contrary to the express terms of the credit, impairs these principles. *See* J. Dolan, *The Law of Letters of Credit* ¶ 10.03 (1984 & 1990 Supp.). An issuer will not be able to discharge its responsibility merely by determining whether the documents conform on their face with the terms of the credit. Rather, the issuer will be forced to examine the underlying transaction between the customer and the beneficiary and decide whether strict compliance with the terms of the credit should be required. This materially alters (increases) the risk the issuer has bargained for and it also diminishes the certainty associated with letters of credit.[8] *See FDIC v. Bank of Boulder*, 865 F.2d 1134, 1143–46 (10th Cir.1988) (Baldock, J., dissenting). To recognize a transfer by operation of law may be permissible even in light to these policies, but recognizing a subsequent voluntary transfer, i.e., from FDIC-receiver to FDIC-corporation, unnecessarily compromises these state-law policies which are fundamental to the commercial utility of documentary credits. *See* Colo.Rev.Stat. § 4–5–116 comment 1 (allowing beneficiary to assign credit may deprive customer of "real and intended security").

Unlike a documentary credit, a tort is not a commercial instrument which constitutes a medium of exchange. Choses in action generally do not facilitate commerce. They are not regularly exchanged. The underlying conduct giving rise to tort actions hardly will be affected if the tort is assignable. Thus, the statement in *FDIC v. Rectenwall*, 97 F.Supp. at 274, that the language of § 1823(c)(2)(A) "contemplates the unrestricted transferability of every asset of an insured bank, at least where necessary to accomplish the assumption of its deposit liabilities by another insured bank," simply is too broad. For example, it is unlikely that a personal service contract would be assignable. *But see NCNB Texas Nat'l Bank*, 895 F.2d at 1499–1503 (fiduciary appointments, non-transferable under Texas law, may be transferred by FDIC-receiver to federally created bridge bank under former 12 U.S.C. § 1821(i)). While tort actions for the malfeasance of bank officers and directors may be assignable as a matter of federal law, there is no requirement that federal law must supply a rule of decision at odds with uniform state law. *See United States v. Kimbell Foods*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (holding that a national rule is not needed to determine the priority of liens arising from federal lending programs); *D'Oench*, 315 U.S. at 473–74, 62 S.Ct. at 686–87 (Jackson, J., concurring) ("No doubt many questions as to the liability of parties to commercial paper which comes into the hands of the [FDIC] will best be solved by applying the local law with reference to which the makers and the insured bank presumably contracted.").

Footnote 6 continued

 transaction between the customer and the beneficiary. 1974 UCP, General provisions and definitions c.; *Colo Nat'l Bank v. Board of County Comm'rs*, 634 P.2d 32, 37 (Colo.1981).

7. An issuer must insist that the documents presented by the beneficiary strictly comply on their face with the terms of the documentary credit. The issuer will then have a limited responsibility—if the documents conform, the issuer must honor the draft; if not, the issuer must not honor the draft. Colo.Rev.Stat. § 4–5–114 (1974 & 1989 Supp.); *American Coleman v. Intrawest Bank*, 887 F.2d 1382, 1386 (10th Cir.1989) ("The duty of the issuing Bank is ministerial in nature, confined to checking the presented documents carefully against what the letter of credit requires."); *Arbest Constr. Co. v. First Nat'l Bank & Trust Co.*, 777 F.2d 581, 584–85 (10th Cir.1985). In our diversity jurisdiction, we have discussed the importance of the strict compliance principle and determined that Colo-

rado law would retain a strict compliance test, not one based upon substantial compliance, even when the deviation between the draft and the credit is trivial or technical in nature. *American Coleman*, 887 F.2d 1385–87.

8. Bankers generally know the risks involved when they issue a documentary credit. Bankers are not philanthropists, but rather charge a fee for issuing a letter of credit. That fee is a function of the risks involved. By changing the rules governing documentary credits, both state and international, and thus allowing assignment of a credit in the absence of an express designation of transferability, the court will contribute to an increased fee associated with the issuance of documentary credits to compensate for increased risk. *See* J. Dolan, *The Law of Letters of Credit* ¶ 10.03[3] (1984) (discussing risk of litigation inherent in erosion of strict compliance principle).

"Commercial agreements traditionally are the domain of state law." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 263, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979). The presence of a uniform rule restricting assignment, absent an express provision, argues forcefully against a contrary federal rule for the benefit of the FDIC. The UCC provision concerning assignment is in use in all fifty states, 2A Uniform Laws Ann. § 5-116 (Master Ed.1977 & 1990 Pamp.), and the UCP is in use throughout the world. The court's opinion would be on much firmer ground if the UCP and the UCC prohibited assignment altogether, but that is not the case. Both the UCP and the UCC allow for a right to assign proceeds even when the beneficiary's right to draw upon the credit is not assignable. 1974 UCP art. 47; Colo.Rev.Stat. § 4-5-116(2) (1989 Supp.). Both the UCP and the UCC allow for assignment if the credit is expressly designated as transferable or assignable by the issuer. 1974 UCP art. 46(b); Colo.Rev.Stat. § 4-5-116(1) (1974). Thus, the UCC and the UCP provisions hardly stand as a bar to potential FDIC collection efforts; the FDIC is free to insist that its member banks only accept assignable letters of credit as security for loans. Moreover, assuming that Colorado law would recognize a transfer by operation of law to FDIC-receiver, FDIC-receiver could have assigned the proceeds to FDIC-corporate. These alternatives within the present scheme suggest that this is hardly an unsolvable problem for the FDIC that would justify federal preemption either by statute or federal common law. Like any creditor, the FDIC wants to collect on its own terms, *United States v. Yazell*, 382 U.S. 341, 348-49, 86 S.Ct. 500, 504-05, 15 L.Ed.2d 404 (1966), but only if the UCC provision concerning assignment is a "significant threat" to the accomplishment of the FDIC's objectives would that uniform provision be preempted. *See Wallis v. Pan American Petroleum Co.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). Given the range of options which was available to the FDIC to collect on this documentary credit, the FDIC has not shown a sufficient conflict with the FDIC's objectives to warrant preemption. *See* P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart and Weschsler's The Federal Courts and the Federal System* 896 (3rd ed. 1988) ("The general proposition that state law cannot contradict or impede or violate a valid federal regulatory program is easily stated. Whether under the circumstances a contradiction really exists may, however, raise difficult and subtle problems."). The national and international consistency concerning assignment of documentary credits should give us pause before adopting a rule which disrupts commercial relationships based upon established state law.